# In the District Court of the United States
# For The District of South Carolina
### BEAUFORT DIVISION

| | | |
|---|---|---|
| **ALTHEA W. JACKSON,** | ) | Civil Action No. 9:07-1083-MBS-GCK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **REPORT AND RECOMMENDATION** |
| **Commissioner of Social Security**, | ) | **OF THE MAGISTRATE JUDGE** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.  INTRODUCTION

This case is before the Court pursuant to Local Civil Rule 83.VII.02, D.S.C., concerning

the disposition of Social Security cases in this District, and Title 28, United States Code Section

636(c).  The plaintiff, Althea W. Jackson (the "Plaintiff" or "Claimant"), brought this action

pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain

judicial review of a final decision of the Commissioner of Social Security denying her claim for

disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-

433.[1]

---

[1]    The Social Security Disability Insurance Program, established by Title II of the Act as amended, 42 U.S.C. § 401 *et seq*., provides Disability Insurance Benefits ("DIB") to disabled persons who have contributed to the program while employed.  The regulations for determining disability are set forth at 20 C.F.R. pt. 404.

## II.  BACKGROUND TO THE CLAIM

Plaintiff was born on November 6, 1965.  She has a high school education for which she received a diploma.[2]  She has worked as an assembler making window sashes, as a packer of automotive belts, as a sales clerk in the J.C. Penney department store, and as a tagger in a clothing manufacturing plant.  (Tr. 60).

## III.  ADMINISTRATIVE PROCEEDINGS

Plaintiff was 38 years old at the time she alleged disability, starting on December 9, 2003 due to foot, ankle, hip and back pain from multiple symptoms including:  tarsal tunnel syndrome, mononeuritis - lower limb, heel spur, plantar fasciitis, chronic tenosynovitis with instability of gait, hip pain, lower back pain with radiculopathy, and hypertension..  (Tr. 118, 143, 158).  She filed an application for DIB on June 14, 2004, which was denied initially on July 7, 2004 and upon reconsideration on February 1, 2005.  (Tr. 15).  Plaintiff timely requested a hearing, which was held before Administrative Law Judge Albert A. Reed (the "ALJ"), on April 18, 2006 in Columbia, South Carolina.  Plaintiff was present, and although informed of the right to representation, she chose to appear and testify without the assistance of an attorney.  Rebecca Bruce, M.A., a vocational expert, was present at the hearing and testified.  Marcella Williams, the Plaintiff's cousin, also was present and testified at the hearing.  (Tr. 214-241).

---

[2]     Although the SSA documents indicate she completed one year of college (Tr. 63), Claimant testified at the hearing that she did not attend college.  (Tr. 218)

After the administrative hearing, the ALJ determined that (1) Plaintiff retained the residual functional capacity (RFC) to perform a full range of sedentary[3] work; (2) her past relevant work was precluded by her RFC; (3) there were a significant number of other jobs in the national economy that she could perform; and (4) she was not under a "disability" as defined by the Act at any time through the date of his decision. (Tr. 18-20) On September 26, 2006, Plaintiff requested review of the ALJ's decision (Tr. 11), and on April 11, 2007, the Appeals Council denied Plaintiff's request for review (Tr. 5-8), thereby making the ALJ's decision the Commissioner's final decision for purposes of judicial review. *See* 20 C.F.R. § 404.981.

## IV.  MEDICAL EVIDENCE OF RECORD

Plaintiff has a history of heel spurs and foot surgery dating back to 1990. (Tr. 225)  On April 24, 2003, Plaintiff presented to Dr. Mackie J. Walker, DPM, of Carolina Podiatric Medical Associates in Aiken, with complaints of left foot pain. (Tr. 109)  Dr. Walker diagnosed plantar fasciitis and prescribed ice massages and stretching exercises. (Tr. 109)  Additionally, x-rays suggested a left heel spur (Tr. 109).  Dr. Walker dispensed Mobic 75 mg., and asked Plaintiff to return in two weeks for a possible sonogram. (Tr. 109)  An ultrasound of the left heel was taken in May, which showed the left proximal plantar fascia origin dramatically thickened and hypoechoic at the medial band, measuring 7.4 mm versus 4.4mm on the right side. Dr. Walker's impression was severe plantar fasciitis of the left foot. He instructed Plaintiff to continue with

---

[3]    A sedentary job is defined as one which involves sitting. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567 (2007). All citations to the C.F.R. are to the 2007 edition unless otherwise noted.

therapy and return in three weeks.  (Tr. 108)  Plaintiff returned in May with minimal

improvement but had been non-complaint with her stretching exercises.  Dr. Walker strongly

emphasized the importance of home physical therapy.  Dr. Walker injected Plaintiff's foot with

Dexamethasone phosphate and Carbocaine at the trigger point area.  (Tr. 108)  In June, Plaintiff

related only 50% improvement.  In July, Plaintiff was wearing her orthotics constantly, and she

was advised to break them in gradually.  (Tr. 108)

          In August , Plaintiff returned complaining the orthotics caused pain and discomfort.  (Tr.

81)  On August 23, 2003, Plaintiff returned to have another pair of orthotics dispensed and fitted.

She continued to have complaints of pain in the left and right heels consistent with chronic

plantar fasciitis/heel spur syndrome.  Treatment thus far had provided minimal relief.  Dr.

Walker discussed alternative treatments, extracorporal shock wave therapy, and surgery.  (Tr.

81)

          On visits to Dr. Walker in September and October 2003, Plaintiff continued to have only

minimal relief and improvement.  Dr. Walker discussed shock wave therapy.  Plaintiff had

continued symptoms of left heel pain, tenderness, burning, and numbness to her arch, heel and

toes.  Dr. Walker scheduled neurosensory testing to rule out tarsal tunnel syndrome.  (Tr. 105)

Neurosensory junction testing on October 14, 2003 suggested early bilateral tarsal tunnel

syndrome.  A treatment plan was discussed and Plaintiff asked to return in two weeks for further

evaluation. (Tr. 105-106)  Two weeks later Dr. Walker noted Plaintiff had numbness, burning,

pain, and plantar fracture of the right foot.  Dr. Walker injected Dexamethasone phosphate and

Carbocaine at the trigger point.  (Tr. 105)

The following month, on November 21, 2003, Plaintiff returned with continued pain in the left heel consistent with chronic plantar fasciitis/heel spur syndrome.  Dr. Walker wrote that conservative treatment had offered Plaintiff minimal relief.  He discussed other treatments with her including additional extracorporal shock wave therapy and surgery.  Dr. Walker advised her that it could still take up to 12 months for her foot to feel better after surgery.  (Tr. 105)  At Plaintiff's next visit on December 1, 2003, Dr. Walker wrote that his findings were consistent with prior examination of and diagnosis of heel spur plantar fasciitis left foot.  He scheduled Plaintiff for foot surgery at Columbia Surgery Center.

On December 11, 2003, Plaintiff underwent left foot extracorporeal shock wave therapy (ESWT).  (Tr. 104)  On a follow-up visit from surgery, Plaintiff stated her heel was improving but the pain was persisting.  She had numbness and left hallux secondary to nerve block.  Dr. Walker advised her it would take some time to recover from the procedure.  (Tr. 103)  Plaintiff had two visits in January 2004 with Dr. Walker.  She had medial arch pain and tenderness at the tibialis posterior tendon.  It was two months post-op with no improvement.  Dr. Walker again injected Dexamethasone phosphate and Carbocaine at the trigger point.  (Tr. 103)

On February 4, 2004, Dr. Walker diagnosed bilateral heel spurs and chronic plantar fasciitis and discussed surgical intervention by endoscopic plantar fasciotomy.  (Tr. 103)  At a follow-up appointment with Dr. Walker on March 3, 2004, Plaintiff continued to complain of bilateral heel pain.  (Tr. 165)  Dr. Walker discussed surgical options with Plaintiff and surgery was scheduled for March 23, 2004.  (Tr. 165)  On March 23, 2004, Plaintiff underwent bilateral plantar fasciotomy surgery.  (Tr. 102)  Her post-op diagnosis was heel spur/plantar fasciitis left

and right foot.  (Tr. 102)  Dr. Walker's medical records from April show Plaintiff had persistent

tenderness, swelling and recurring pain post surgery.  Dr. Walker prescribed Naprosyn 375 mg.

(Tr. 101)  Dr. Walker treated Plaintiff the following month.  She had increased pain and

swelling, and Dr. Walker advised her of a possible tear at the surgical site.  He prescribed Bextra

30mg. and dispensed Lidoderm patches for night pain.  On May 25, 2004, Plaintiff returned with

continued complaints of "burning and numbness" in the right medial arch and heel along with

increasing pain.  (Tr. 101)  Dr. Walker discussed the possibility of tarsal tunnel syndrome with

her.  Plaintiff had a positive Tinel's sign at the posterior tibial nerve, and the medial and lateral

plantar nerves. He recommended neurosensory testing on her next visit.  (Tr. 101)

Neurosensory testing results were conducted June 1, 2004 and indicated bilateral tarsal

tunnel syndrome, nerve entrapment, injury to L4-5 and S1 nerve root, peripheral neuropathy, and

axonal loss.  (Tr. 98-100)  Dr. Walker continued her on Naprosyn, increasing the dosage to 500

mg. for pain.  (Tr. 98)  On June 15, 2004, Plaintiff reported some relief of her pain with

medication.  (Tr. 98)  On July 15, 2004, Dr. Walker noted that Plaintiff's heel pain had

improved, but she continued to have "burning and numbness" of the medial arch and toes, and

increased swelling in both feet and ankles.  Plaintiff was unable to stand for one hour without

experiencing pain.  (Tr. 161)  On August 5, 2004, Dr. Walker wrote, "Conservative treatment has

afforded the patient minimal relief."  He noted that Plaintiff's plantar fasciitis pain had resolved,

but her tarsal tunnel symptoms persisted and he discussed decompression of the tarsal tunnel

again and decompression of medial and lateral plantar nerves, and calcaneal nerve.   (Tr. 161)

Dr. Walker noted that there would be a two to six month recovery period and it might take up to

a year for her foot to feel better. (Tr. 161) He wrote that Plaintiff remained unable to function because of tarsal tunnel symptoms. He completed a handicap parking form for her, and noted that Plaintiff was to remain off work. He advised her to consult with her employer regarding ongoing disability. (Tr. 161)

On August 19, 2004, Plaintiff again saw Dr. Walker and complained of continuing pain and increased burning and numbness in her left arch and foot. Surgical options again were discussed, and surgery was scheduled for September 21, 2004. Vicodin was prescribed for post-operative pain. (Tr. 160)

Meanwhile, on January 27, 2005, Richard Weymouth, M.D., reviewed Plaintiff's records at the request of the Commissioner and completed a Residual Functional Capacity Assessment form. (Tr. 122-27) Dr. Weymouth determined that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. (Tr. 123)

On February 7, 2005, Plaintiff again saw Dr. Walker and complained of pain in her left foot. She was scheduled for decompression surgery at Columbia Surgery Center. (Tr. 160)

On March 8, 2005, the Plaintiff underwent tarsal tunnel decompression, left foot, decompression medial and lateral plantar nerves, decompression medial calcaneal nerve, and decompression of the deep peroneal nerve, left foot. Her post-op diagnosis was tarsal tunnel syndrome, left foot, and neuropathy of the medial and lateral plantar nerves, medial calcaneal nerve, and decompression of the deep peroneal nerve. (Tr. 158) She was seen on March 14, 2005 for a post-op check and complained of numbness. (Tr. 160) On March 24, she was seen

two weeks post-op, had every other suture removed, and instructed to continue using crutches and the ankle-foot orthosis (AFO) brace on her lower leg and foot.  (Tr. 146)

On March 31, 2005, Plaintiff's final sutures were removed and Dr. Walker noted wound dehiscence at the suture site.  The site was treated multiple times with cytokines (Exsikines). (Tr. 146)  On April 4, 2005, she was seen for followup and instructed to discontinue the use of crutches.  (Tr. 146)  On April 11, 2005, Plaintiff complained of some shooting pain in her left foot.  Dr. Walker planned to conduct further neurosensory testing to evaluate healing of the surgical site and nerves.  (Tr. 146)

On May 3, 2005, Dr. Walker scheduled Plaintiff to attend physical therapy sessions three times a week for 3 weeks.  (Tr. 157)   The PT records reflect that Plaintiff felt better although she continued to have left foot pain and some swelling.  (Tr. 147-157)

On May 12, 2005, Plaintiff was treated at the Blackville Medical Clinic, where she had been a patient since 1997,[4] for back spasms, and prescribed Skelaxin.  (Tr. 190).

On June 6, 2005, Dr. Walker saw Plaintiff three months post-op and noted she was unable to walk without use of the AFO and she had pain upon palpitation and continued swelling.  Dr. Walker prescribed Solaraze 100 mg.  (Tr. 146)  Dr. Walker saw Plaintiff twice in July, 2005.  She related minimal change and improvement, but her episodes of pain had diminished somewhat.  She was slowly weaning herself off of the AFO but was unable to wear shoes for more than 2-3 hours without pain.  Dr. Walker scheduled her for physical therapy three

---

[4]    Plaintiff was diagnosed with hypertension and prescribed Triam/HCTZ 37.5.

times a week for 3 weeks, but at her August 22 appointment, she informed him she was unable to go because of lack of insurance coverage.  (Tr. 144 - 146)

On July 14, 2005, Plaintiff again was seen at the Blackville Medical Clinic for complaints of headaches from her blood pressure medication.  Her medication was changed to Benicar.  (Tr. 187, 188)  On August 31, 2005, Plaintiff returned to the clinic because her new blood pressure medication was causing her dizziness, so she was switched to Micardis 40mg. (Tr. 185-186)

On September 8, 2005, Plaintiff again saw Dr. Walker and complained of continuing pain in her left foot and ankle and also she complained of radiating pain from her lower back.  She received some relief from Flexeril.  She was referred to a chiropractor, Dr. Kyles, for a consultation with respect to her back.  (Tr. 144)

Plaintiff was treated for severe low back, hip, and buttock pain at Kyles' Chiropractic Clinic in Aiken, South Carolina from September 13, 2005 though December 7, 2005.  Dr. Kyles' findings included subluxation at R-S1 with posterior medial rotation, and a subluxated L3 with posterior rotation.  Severe reduced motion was evident bilaterally in the lumbosacral region.  She received manipulation, electrical muscle stimulation and hot packs to the lumbar.  Dr. Kyles wrote that the Plaintiff's improvement was impeded by persistent pain.  (Tr. 171-181)

Plaintiff returned to Dr. Walker on October 7, 2005 relating that Dr. Kyles had diagnosed her with a hip displacement.  She had increased pain in her left leg, and Dr. Walker prescribed Celebrex 200mg.  (Tr. 144)  In Dr. Walker's records from October 24, 2005, he noted that Plaintiff had a blister on her left foot, it was not at the healed wound site, and he diagnosed a

superficial dermatosis.  Plaintiff had tenderness at extensor hallucis longus that caused pressure

at the prior surgical site.  He prescribed Solaraze gel and Lidoderm patches.  He advised Plaintiff

that there was a lengthy recovery time for nerve healing.

Plaintiff continued to see Dr. Kyles between September and December 2005 for

dislocation of her hip and sciatic symptoms.  (171-180)  The records reflect some improvement

in Plaintiff's complaints and note that her improvement was hampered by persistent pain, and

also because she did not keep all of her appointments.  (Tr. 171-180)

Dr. Walker's treatment records for the period of October through December 2005, reflect

that Plaintiff continued to have left foot pain and was diagnosed with chronic tenosynovitis.  (Tr.

141-143)  Dr. Walker was concerned about the recurrence of neural entrapment, which he

discussed with her.  (Tr. 143)

On January 13, 2006, Plaintiff returned to Dr. Walker for a follow-up evaluation of joint

pain and tenderness.  Plaintiff related no improvement in her condition.  She had been unable to

have the previously scheduled MRI because it was not covered by insurance. Plaintiff related

difficulty with house work, getting in and out of a chair or car, and pain when climbing stairs.

Dr. Walker's records reflect that Plaintiff's condition was unchanged and getting worse, and she

required aggressive treatment.  He planned to continue activity restrictions, awaiting her

consultation with Dr. Carter. He prescribed Lyrica, 75 mg.  (Tr. 138-139)

In February 2006, Dr. Walker prescribed Motrin 800 mg. as well as Lyrica and referred

Plaintiff to Vocational Rehabilitation.  (Tr. 136-137)  Plaintiff continued to complain of left foot

pain.  (Tr. 132-39)  Plaintiff reported that she had difficulty with house and yard work and in getting in and out of a chair and a car.  (Tr. 132- 139)

On February 23, 2006, Plaintiff was seen at the Blackville Medical Clinic.  Her blood pressure medication was changed again to HCTZ 25.  Plaintiff had increasing lower back pain. Medical notes from the clinic show that Plaintiff had been assessed with lower back pain with radiculopathy.  X-rays had been ordered for bilateral hip and L5 pain.  (Tr. 182)

On March 13, 2006, Dr. Walker referred Plaintiff to AIM for acupuncture with Dr. Enlund.  (Tr. 134-135)  On March 20, 2006, Dr. Walker re-evaluated Plaintiff.  He advised her to continue on activity restrictions as previously advised, continue with acupuncture with Dr. Enlund and ordered Plaintiff evaluated and treated for physical therapy sessions including myofascial release, and neuromuscular re-education.  (Tr. 132-133)

In a "To Whom It May Concern" letter dated March 29, 2006, Dr. Walker wrote: "[Plaintiff] is unable to bear weight in excess of 30 minutes on her left foot and cannot walk more than one city block without pain.  As a result of this condition, [Plaintiff] has put on weight, which has aggravated her condition."  (Tr. 131)

Plaintiff has been prescribed the following medications:  Vioxx, Naprosyn 500 mg., Bextra 30mg., Lidoderm Patches, Lyrica, 75 mg. Triam /HCTZ 37.5, Celebrex, Skelaxin.  (Tr. 62, 136-137,144, 190)

## V.  ADMINISTRATIVE HEARING TESTIMONY

At the hearing on April 18, 2006, Plaintiff appeared without counsel.  (Tr. 214)  She confirmed that she had received a notice of her right to be represented, and after ALJ Reed went

over her rights with her, he asked if she wanted a postponement or wished to proceed.  (Tr. 215)
Plaintiff said she wished to proceed.  (Tr. 216)

   The Plaintiff testified that she currently lives in Williston, South Carolina, with her
husband and minor child.  (Tr. 217)  Plaintiff completed her education to a high school level and
received a diploma.  (Tr. 218)  With respect to past work experience, Plaintiff worked as a
window builder for Efco Corp. in Barnwell.  (Tr. 220)  Plaintiff's job required her to stand most
of the day and lift 10 -30 pounds.  (Tr. 221)  Prior to Efco, Plaintiff was employed as a sales
clerk at JC Penney's.  Plaintiff stated she also worked at Daco Products in Williston, South
Carolina, as a packer.  Plaintiff's job at Daco required her to stand most of the day and lift up to
30 pounds.  Plaintiff also worked at Huge Aircraft in Orangeburg as an assembler, and at Salley
Manufacturing as a packer.  (Tr. 222-224)

   Plaintiff testified that the problem with her feet began in 1990, when she had heel spur
surgery on her left foot.  A second heel surgery was performed about 1995.  Plaintiff stated there
were some complications after the surgeries and she now suffers with resultant hip and back
pain.  (Tr. 225)  In total, Plaintiff has had three surgeries on her left foot and two surgeries on her
right foot.  (Tr. 226)  Since having surgery on her left foot, Plaintiff suffers from pain and
swelling.  (Tr. 226)  She has trouble wearing fitted shoes.  The ALJ noted that Plaintiff was
wearing shoes at the hearing (Tr. 226) and Plaintiff pointed out she was wearing "something I
slide my foot in" and stated that she could not wear a "tie up" shoe or "a string up shoe"–in other
words, a shoe with laces.  (Tr. 226).  Plaintiff has been treated for foot pain with pain patches,
Naproxen and Motrin.  Plaintiff's last foot surgery on her left foot was on March 7, 2005.

Plaintiff's last surgery on the right foot was in 2003. (Tr. 226) Plaintiff stated that her medical condition has limited her daily activities. She uses an electric scooter while shopping at Wal-Mart, because her feet swell and become painful if she stands. (Tr. 227, 231) Plaintiff has difficulty sitting because of pain in her hip. (Tr. 227) Plaintiff had hip x-rays, which revealed her "hip was out of line" then she was referred for an MRI, but her insurance does not pay for such tests, and she could not afford it. Therefore, she sought treatment from a chiropractor and also has received acupuncture treatment. (Tr. 228)

Plaintiff was treated by her regular medical doctor who gave her injections for pain. (Tr. 229) Plaintiff stated that she suffered from depression and her doctor prescribed Zoloft. She stopped taking Zoloft after she heard of an incident where a young man claimed taking Zoloft made him kill his grandparents. (Tr. 230)

Plaintiff's minor son helps her with the house chores. (Tr. 230-231) Plaintiff generally spends the day with her mother. (Tr. 232)

Plaintiff's cousin, Marcella Williams, testified that she visits Plaintiff about four times per week. She has observed Plaintiff suffer with hip, leg, back and foot pain. Ms. Williams stated that Plaintiff lies down frequently due to pain. (Tr. 234)

The ALJ then examined Rebecca Bruce, vocational expert, regarding assessment of the Plaintiff's work history, skill level, and exertion level. The vocational expert described Plaintiff's work as an assembler as medium, unskilled level, which required medium physical exertion. (Tr. 239) Plaintiff's job as a ticketer was unskilled with light physical exertion. Plaintiff's work as a packer required medium physical exertion. (Tr. 239)

ALJ Reed stated he would keep the record open for 30 days and requested Plaintiff submit her additional medical records from her chiropractor (*see* Tr. 216) by then. He then closed the record and adjourned the hearing. (Tr. 240-241)

## VI. THE COMMISSIONER'S FINDINGS

In making his determination that the Plaintiff was not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

1.    The claimant meets the insured status requirement of the Social Security Act through December 31, 2009.

2.    The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b) and 404.1571 et seq.).

3.    The claimant has the following severe impairments: a history of plantar fasciitis, tarsal tunnel syndrome, and chronic tenosynovitis (20 CFR 404.1520 (c).

The claimant's history of plantar fasciitis, tarsal tunnel syndrome, and chronic tenosynovitis result in significant functional restrictions, and are severe.

She also has hypertension which is generally well-controlled, according to readings reflected in the record. There is no evidence of heart failure, ischemia, visual disurbance, renal involvement or stroke to indicate complications from high blood pressure (Exhibit 5F). Thee are no functional restrictions associated with the claimant's hypertension, and it is not severe.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of sedentary work.

6.    The claimant is unable to perform any past relevant work. (20 CFR 404.1565).

7.    The claimant was born on November 6, 1965, and was 38 years old on the alleged disability onset date, which is defined as a younger individual age 18 --44 (20 CFR 404.1563)

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR 404.1568).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566)

11.    The claimant has not been under a "disability," as defined in the Social Security Act, from December 9, 2003, through the date of the decision (20 CFR 404.1520(g)).  (Tr. 17-20)

## VII.  SCOPE OF REVIEW

Under the Social Security Act, 42 U.S.C. § 405(g), this Court's scope of review of the Commissioner's "final decision regarding disability benefits is limited to determining whether the findings are supported by substantial evidence and whether the correct law was applied." *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).

The Court's scope of review is specific and narrow.  It does not conduct a *de novo* review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence.  42 U.S.C. § 405(g); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Teague v. Califano*, 560 F.2d 615, 618 (4th Cir. 1977).  Such evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Shivey v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).  Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  It is the duty of the ALJ reviewing the case, and not the duty of the Court, to make findings of fact and resolve conflicts in the evidence. *Hays*, 907 F.2d at 1456.  In reviewing for substantial evidence, the court does not weight conflicting evidence, make credibility determinations, or substitute its judgment for that of the agency. *Id.*  If substantial evidence supports the

Commissioner's decision that a claimant is not disabled, the decision must be affirmed. *Blalock*,

483 F.2d at 775.

## VIII.  THE APPLICABLE LAW AND REGULATIONS

The Social Security Act provides that disability benefits shall be available to those

persons insured for benefits, who are not of retirement age, who properly apply, and who are

"under a disability."  42 U.S.C. § 423(a).  Disability is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can expected
> to result in death or which has lasted or can be expected to last for at least
> 12 continuous months.

To facilitate a uniform and efficient processing of disability claims, the Social Security

Act has by regulation reduced the statutory definition of "disability" to a series of five sequential

questions that are to be asked during the course of a disability determination.  20 C.F.R. §§

404.1520, 1520a (2006); *Heckler v. Campbell*, 461 U.S. 458 (1983); *Mastro v. Apfel*, 270 F.3d

171, 177 (4th Cir. 2001); *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).  The five questions are:

> (1) Whether the claimant is engaged in substantial gainful activity as defined in Sections 404.1510,
> 404.1571 et seq.  If such determination is affirmative, no disability will be found.  20 C.F.R. §
> 404.1520.
>
> (2) Whether the claimant's impairments meet the durational requirement (Section 404.1509), and
> are severe (Section 404.1520(c)).  If they do not meet those requirements, no disability will be
> found.  20 C.F.R. §§ 404.1509, 404.1520(c).
>
> (3) Whether the claimant has an impairment which meets or medically equals a condition contained
> within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404,
> Subpart P, App. 1) (the "Listing of Impairments") 20 C.F.R. § 404.1520(d).  If one of the listings is
> met, disability will be found without consideration of age, education or work experience.  20 C.F.R.
> § 404.1520(d).
>
> (4) Whether the claimant has an impairment which prevents past relevant work.  20 C.F.R. §
> 404.1520(e).
>
> (5) Whether, in light of vocational factors such as age, education, work experience and RFC, the
> claimant is capable of other work in the national economy.  The claimant is entitled to disability only
> if the answer is "no."  20 C.F.R.§ 404.1520(f).

An individual may be determined not disabled at any step if found to be:  gainfully employed, not severely impaired, not impaired under the Listing of Impairments, or capable of returning to former work.  In such a case, further inquiry is unnecessary.  If, however, the claimant makes a showing at Step Four that return to past relevant work is not possible, the burden shifts to the Commissioner to come forward with evidence that the claimant can perform alternative work and that such work exists in the national economy.  *English v. Shalala*, 10 F.3d 1080 (4th Cir. 1993); *Harper v. Bowen*, 854 F.2d 678 (4th Cir. 1988); *Coffman v. Bowen*, 829 F.2d 514 (4th Cir. 1987).  The Commissioner may meet this burden by relying on the Medical-Vocational Guidelines (the "Grids") or by calling a vocational expert to testify.  20 C.F.R. § 404.1566.  The Commissioner must prove both the claimant's capacity and the job's existence.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

## IX.  ANALYSIS OF THE ALJ'S DECISION

At the first step of the sequential evaluation process, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since her alleged onset of disability.  (Tr. 17, Finding 2)  At the second step, the ALJ found that Plaintiff's history of plantar fasciitis, tarsal tunnel syndrome, and chronic tenosynovitis were severe impairments.  (Tr. 17, Finding 3)  At the third step, the ALJ found that Plaintiff's impairments did not meet or equal one of the impairments listed in the Listing of Impairments.  (Tr. 17, Finding 4)  At the fourth step, the ALJ found Plaintiff was unable to perform her past relevant work (Tr. 19, Finding 6) but determined that Plaintiff retained the residual functional capacity to perform a full range of sedentary work:

The claimant cannot stand for more than 30 minutes at a time or walk more than one city block without resting, which is compatible with a full range of sedentary work.  A sedentary job is defined as one that involves sitting most of the time, with only brief periods of walking and standing.  It

involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  (Tr. 19, Finding 5)

At the fifth step of the sequential evaluation process, the ALJ accepted the VE's testimony that a person of Plaintiff's age, with her educational background, work experience, and residual functional capacity, could perform the full range of sedentary work as directed by the Medical-Vocational Rules 201.27, 201.28 and 201.29.  (Tr. 20, Finding 10)

## X.  PLAINTIFF'S OBJECTIONS

The Plaintiff raises two objections in her Brief:

I.     The ALJ did not explain his findings regarding the Plaintiff's residual functional capacity, as required by Social Security Ruling 96-8p.

II.    The ALJ failed to consider all of the Plaintiff's impairments in making the RFC determination.

## XI.  DISCUSSION

### A.  Introduction

As a threshold matter, it must be noted that "Social Security proceedings are inquisitorial rather than adversarial" and that the ALJ has the duty "to investigate the facts and develop the arguments both for and against granting benefits."  *Sims v. Apfel*, 530 U.S. 103, 111 (2000), *citing Richardson v. Perales*, 402 U.S. 389 (1971); *see also Easley v. Finch*, 431 F.2d 1351 (4th Cir. 1970) (hearings on applications for Social Security disability entitlement are not adversary proceedings).  The ALJ has a heightened duty to investigate the facts when a claimant is appearing *pro se*.  *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980).

The record reflects that the ALJ engaged in a very brief colloquy with the Plaintiff at the hearing to determine whether Plaintiff wished to have an attorney present.  The Plaintiff elected to proceed without assistance of counsel.  While the Commissioner has no duty to insist that a

claimant have counsel (*Hartsell v. Bowen*, 861 F.2d 264 (Table) (per curiam), 1988 WL 109271 at *2 (4th Cir. 1988), *citing Marsh v. Harris*, 632 F.2d. 296 (4th Cir. 1980)), when a claimant elects to proceed *pro se*, the ALJ has "a duty to assume a more active role in helping claimants develop the record." *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980). The ALJ is required by both regulation (20 C.F.R. § 404.927) and caselaw to fully develop the record, and to inquire into each issue raised at the administrative hearing. *Fleming v. Barnhart*, 284 F.Supp.2d. 256, 272 (D.Md. 2003). Regardless of whether a claimant does or does not have counsel, the ALJ must ensure that he "looks fully into the issues, questions [the claimant] and the other witnesses, and accepts as evidence any documents that are material to the issues. The Administrative Law Judge may stop the hearing temporarily and continue it at a later date if he or she believes that there is material evidence missing at the hearing." 20 C.F.R. § 404.944. "The ALJ is permitted to develop the record in several ways, including questioning witnesses, requesting evidence, and subpoenaing witnesses." *Fleming, citing* 20 C.F.R. §§ 404.944, 404.950(d). "While a lack of representation by counsel is not by itself an indication that a hearing was not full and fair, the ALJ has a *heightened duty* in cases involving *unrepresented* claimants, as in this case, to develop the factual record." *Fleming v. Barnhart*, 284 F.Supp.2d 256, 272 (D.Md. 2003) (emphasis in original). "The Fourth Circuit has held that when a claimant is not represented, the ALJ is under a heightened duty to ensure that all the facts of the case are fully explored, and that a failure on the part of the ALJ to perform this duty may result in prejudice to the claimant, thus requiring the case to be remanded for further proceedings." *Fleming*, 284 F.Supp.2d 272-273, *citing Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981) (holding that the ALJ failed in her duty to scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts in a case involving an

unrepresented, poorly educated, *pro se* claimant); *Sims v. Harris*, 631 F.2d 26, 27-28 (4th Cir. 1980); *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  As Chief Judge Legg held in *Fleming*, "[T]he ALJ has a duty to explore all relevant facts and inquire into issues necessary for adequate development of the record, and cannot rely on the evidence submitted by the claimant when that evidence is inadequate."  *Fleming, quoting Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is held to a high standard in discharging this fact-finding requirement. *Snyder v. Ribicoff*, 307 F.2d 518 (4th Cir. 1962), *cert. denied sub nom. Heath v. Celebrezze*, 372 U.S. 945 (1963).  "Moreover, evidentiary gaps that result in unfairness or clear prejudice require a remand."  *Fleming, quoting Brown v. Shalala*, 44 F.3d 931, 935-36 (11th Cir. 1995); *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980); *see also Crider v. Harris*, 624 F.2d 15 (4th Cir. 1980).

Additionally, other circuits have held that, in cases involving pro se claimants, reviewing courts also have a heightened duty to make a searching investigation of the record to ensure that the claimant's rights have been adequately protected.  *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980); *Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 43 (2d Cir. 1972) (stating that it felt particularly compelled to make such an investigation in cases where the attitude of the hearing examiner did not measure up to the examiner's statutory duty to scrupulously and conscientiously develop all the relevant facts); *Miracle v. Celebrezze*, 351 F.2d 361, 382-83 (6th Cir. 1965).

The undersigned has closely reviewed the transcript and finds that the ALJ failed to discharge his duty to ensure that the facts of the case were fully and adequately explored.  First, a review of the transcript reveals that the ALJ was wholly inadequate in discharging his duty to elicit all of the relevant facts from the *pro se* claimant.  With respect to medications, Plaintiff

recalled that she was prescribed Naprosyn, pain patches, Motrin, and used "some gel like substance to put on the top." (Tr. 226) The record contained references to the various medications that Plaintiff had been prescribed (Flexeril, Cymbalta, Vioxx, Naprosyn 500 mg., Bextra 30mg., Lidoderm Patches, Solaraze gel, Lyrica, 75 mg. Triam /HCTZ 37.5, Celebrex, and Skelaxin (Tr. 62, 136-137,144, 190)), and given the heightened duty the ALJ had toward the *pro se* claimant, the ALJ failed to meaningfully enquire as to whether Plaintiff was still taking these medications. (Tr. 226) Moreover, the ALJ failed to enquire as to whether Plaintiff suffered any side effects from these medicines. Side effects of medications are relevant in determining the claimant's RFC. *See* SSR 96-8p.

Second, even though Plaintiff testified that after three surgeries, her left foot was "painful" and "swells constantly," the ALJ failed to enquire about the daily level of pain experienced by the Plaintiff, and how her pain effected her daily activities (Tr. 226) although he did question her briefly about her daily activities. (Tr. 227)

Third, although the ALJ plainly elicited testimony from the Plaintiff regarding the five foot surgeries she had undergone (Tr. 226), the ALJ's written decision incorrectly reports that Plaintiff only underwent three foot surgeries. (Tr. 18) It cannot be said that the ALJ's decision is based upon substantial evidence when it is based upon an incorrect statement of such basic factual information as the number of foot surgeries undergone by the Plaintiff.

For these reasons, the court recommends a remand. Next, the court will address the reasons for remand articulated by Plaintiff's counsel.

I.    The ALJ did not explain his findings regarding the Plaintiff's residual functional capacity, as required by Social Security Ruling 96-8p.

Social Security Ruling 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and non-medical evidence (*e.g.*, daily activities, observations)." This ruling further provides:

> In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

The ALJ is also required to include in his RFC assessment "a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Significantly, the "RFC assessment must always consider and address medical source opinions," and in cases where the assessment conflicts with an opinion from a medical source, the ALJ "must explain why the opinion was not adopted." *Id.*

In the present case, the ALJ failed to thoroughly discuss the evidence or the basis for the Plaintiff's RFC determination. The hearing decision consists of only four paragraphs that actually summarize the medical evidence. (Tr. 18) The findings on testing of significant nerve damage, including damage to the nerves that could result from the Plaintiff's back problems, were not even mentioned. (Tr. 167-170) The ALJ summarily described only a small portion of the evidence, and ignored statements in the medical record supporting more severe limitations.

In the hearing decision, the ALJ found the Plaintiff restricted to sedentary work activity. (Tr. 18) However, the ALJ does not explain how he arrived at these restrictions. The rationale of the decision, which is not even two pages in length, simply states: "After careful consideration of

the entire record, I find that [Plaintiff] has the residual functional capacity to perform a full range of sedentary work." (Tr. 18)  The ALJ does not specifically explain any reasons for the restrictions indicated in the residual functional capacity assessment as set forth in SSR-98-6. Furthermore, the ALJ failed to discuss whether the RFC would be affected by the Plaintiff's need to use a cane to ambulate, or whether the RFC would be affected by her inability to wear anything but slip-on shoes, or whether the RFC would be affected by Plaintiff's difficulty getting up and down out of a chair at times due to her condition.

Judicial review of an administrative decision is impossible without adequate explanation of that decision by the administrator.  *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). Here, the ALJ engaged in no analysis whatsoever of the Plaintiff's functional limitations and her remaining exertional and non-exertional capacities, as required by SSR 96-8p.  In similar situations, the Fourth Circuit Court of Appeals has held that a remand is necessary to clarify the basis for the decision to deny benefits.  For instance, in *Gordon v. Scheiker*, 725 F.2d 231 (4th Cir. 1984), the court vacated and remanded the administrative law judge's decision denying benefits, stating that "[t]he courts . . . face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence.  Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  *Id.* at 236 (*quoting Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977); *Murphy v. Bowen,*, 810 F.2d 433, 437 (4th Cir. 1987) (remanding the case because the administrative law judge did not explain adequately why he credited one doctor's views over those of another

doctor); *see also, Bill Branch Coal Corp. v. Sparks,* 213 F.3d 186 (4ᵗʰ Cir. 2000) (refusing to

"guess" at the administrative law judge's rationale for discounting relevant evidence.).

The ALJ's failure to explain the basis for his determination of Plaintiff's RFC deprives the

court of the ability to conduct a meaningful review of the Commissioner's decision.

**II.    The ALJ failed to consider all of the Plaintiff's impairments in making the RFC determination.**

The ALJ also failed to take into account Plaintiff's non-exertional limitations when

determining her RFC.  Although the Plaintiff also alleged significant limitations related to hip and

back pain, and the ALJ did not find these alleged impairments severe.

Courts in the Fourth Circuit have previously held that an impairment is "severe" if it is

more than "meaningless." *Evans v. Sullivan*, 928 F.2d 109 (4th Cir. 1984), *Reichenbach v.

Heckler*, 769 F.2d 988 (4th Cir. 1985), *Preston v. Heckler*, 769 F.2d 988 (4th Cir. 1985), *Jones v.

Schweiker*, 551 F.Supp. 205 (D. Md. 1982) (defines as "more than meaningless"), *Taylor v.

Heckler*, 590 F.Supp. 480 (D. Md. 1984).  "An impairment can be considered as 'not severe' only

if it is a slight abnormality which has such a minimal effect on the individual that it would not be

expected to interfere with the individual's ability to work." *Cottrill v. Apfel*, 102 F. Supp.2d 627,

634 (D. Md. 2000), *citing Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984).

Plaintiff alleged significant back and hip pain and submitted medical records from a

treating physician and from a chiropractor showing that she had complained for years about these

conditions, and had sought treatment.  (Tr. 171-182, 190-191)  The chiropractor, Dr. Kyles, noted

limited range of motion and severe tenderness.  (Tr. 180)  Plaintiff's podiatrist, Dr. Mackie,

diagnosed "persisting Radiculopathy".  (Tr. 141)  The physician at Blackville Medical Center

diagnosed lumbar radiculopathy.  (Tr. 182)

The medical evidence of record indicates that Plaintiff received diagnoses for her back pain, and was treated for these conditions, as she described at the hearing. However, she was treated for these conditions only to the extent she could afford treatment. For example, the use of a tens unit for pain management (for her back pain) was denied in 2005. (Tr. 141) Other medical records note that Plaintiff was unable to go to physical therapy because of lack of insurance coverage (Tr. 144), and because of the expense (Tr. 146). Her medical records mention time and again that her insurance would not pay for an MRI (*see, e.g.,* Dr. Walker's records at Tr. 134; 136; 138), and thus her medical record is without the results of that test.

The ALJ, however, appears to dismiss Plaintiff's back and hip problems in the hearing decision, in part because there was "no orthopedic involvement, [and] no imaging studies showing abnormality related to the claimant's back and hip complaints[.]" Indeed, the ALJ's conclusion that the Plaintiff was capable of performing sedentary work seems based in some part on the lack of imaging studies or orthopedic records to support Plaintiff's claims of back and hip pain, and also appears to be at least part of the reason that the ALJ found that Plaintiff's statements concerning her limitations to be not credible. (Tr. 19).

As discussed above, is apparent to the court that the Plaintiff was not able to see an orthopedist, or have imaging studies done, because she was of limited financial means. Plaintiff testified that she last worked in 2003 (Tr. 220) and that her husband was disabled due to a back injury, as a result of a truck accident. (Tr. 219)

It is well settled that a Social Security claimant will not be penalized for failing to seek treatment that she cannot afford; "[i]t flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because [she] is too poor to obtain medical treatment that may

help [her]." *Futrell v. Shalala*, 852 F.Supp. 437, 441 (E.D.N.C. 1994), *citing Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986); *see also Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) ("[t]o a poor person, a medicine that he cannot afford to buy does not exist"); *Dover v. Bowen*, 784 F.2d 335, 337 (8th Cir. 1986) ("the ALJ must consider a claimant's allegation that he has not sought treatment or used medications because of a lack of finances").

The undersigned United States Magistrate Judge finds that the record does not contain substantial evidence in support of the findings of the administrative law judge. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir.1990); 42 U.S.C. § 405(g). Thus, it recommends that this case be remanded for further proceedings.

**<u>RECOMMENDATION</u>**

Based upon the foregoing, the Court cannot conclude that the ALJ' s decision to deny benefits was supported by substantial evidence.  It is, therefore, RECOMMENDED, for the foregoing reasons, that the Commissioner's decision be reversed under Sentence Four of 42 U.S.C. § 405(g) and remanded to the Commissioner for a new hearing and a proper RFC assessment.   *See Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

GEORGE C. KOSKO
UNITED STATES MAGISTRATE JUDGE

August 4, 2008

Charleston, South Carolina